UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Graphic Communications International Union,
Local 1B,

Plaintiff,

v.

Civ. No. 01-1770 (JNE/JGL)
ORDER

Bureau of Engraving, Inc., d/b/a The
Bureau Electronics Group,

Defendant.

---

Scott A. Higbee, Esq., Graphic Communications International Union, Local 1B, General Counsel, appeared for Plaintiff Graphic Communications International Union, Local 1B.

Dean A. LeDoux, Esq., Gray, Plant, Mooty, Mooty & Bennett, P.A., appeared for Defendant Bureau of Engraving, Inc., d/b/a The Bureau Electronics Group.

---

This is an action by a union, Graphic Communications International Union, Local 1B (Union), against an employer, The Bureau Electronics Group (Bureau), under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109 (2000) (WARN Act or Act). The Union claims that the Bureau violated the WARN Act by failing to give timely notice of an April 2001 mass layoff at its plant in Minneapolis, Minnesota. The case is before the Court on the Union's motion for summary judgment on the issue of liability and the Bureau's cross-motion for summary judgment.[1] For the reasons given below, the Court grants the motions in part and denies them in part.

---

[1] The Union has also moved for the appointment of a special master to prepare a report on the issue of damages pursuant to Fed. R. Civ. P. 53. This motion is denied.

FILED JUL 0 8 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS

## I. BACKGROUND

The Bureau produced printed circuit boards at its Minneapolis plant. Many of the Bureau's employees were members of the Union. In the fall of 2000, the Bureau's business started to decline at a fairly rapid pace. This downturn led the Bureau to lay off approximately 90 of its 400 employees in January 2001.[2]

On or about April 5, 2001, the Bureau received a memorandum from its largest customer, XeTel, a company that assembled telephones for Ericsson. The memorandum directed the Bureau to stop production on nearly all of the printed circuit boards it had ordered. As a result of the hold order, the Bureau laid off approximately 150 employees. The Bureau announced the April layoff to employees who worked the fourth and fifth shifts in a meeting on April 7, and to employees who worked the first, second, and third shifts in a meeting on April 9. At the meetings, the Bureau gave the employees a written notice identifying the date on which the layoff would begin. The last day of work for most of the fourth- and fifth-shift employees was either April 7 or 8, and the last day for most of the remaining employees was April 12.

By letter dated June 5, 2001, the Bureau informed the Union that the April layoff "may possibly exceed six months in duration." The letter states, in pertinent part:

> The April reduction in force was precipitated by the very sudden and unforeseen loss of a major amount of business by the Bureau, due to significant cancellations by [XeTel] that represented the majority of work orders in place at the Bureau at the time of the layoffs. The Bureau received no advance notice from [XeTel] of its intentions to cancel this work and it was entirely unexpected by the Bureau. At the time the layoffs were initially planned, it was the Bureau's reasonable expectation that they would be temporary in nature and would not likely exceed six months for any employee. Therefore, no notice was required under the [WARN Act] and none was given, because it was not expected that there would be any "employment loss" under the Act.

---

[2] The January layoff was not a "mass layoff" within the meaning of the WARN Act because it did not involve at least 33% of the full-time employees at the plant. *See* 29 U.S.C. § 2101(a)(3)(B)(i)(I).

> However, due to recently changed and unforeseen circumstances, the Bureau's expectations have changed and it is now expected that the April layoff may, in fact, extend beyond six months for some employees. The recently changed circumstances include an up to date industry book-to-bill ratio that is clearly the lowest it has been in years and further industry analysis indicating that the electronics industry may not realize any significant improvement until the 1st quarter of 2002.
>
> Due to these changed circumstances, the Bureau is hereby giving WARN Act notice, pursuant to 29 U.S.C. § 2102(c), of the possibility that the April . . . layoff may exceed six months in duration. As you are aware, several employees from our electronics group have been and will continue to be affected.

The Union brought this action after the Bureau failed to recall any of the employees laid off in January and April within six months. The Union alleges that the employees were entitled to notice of the April layoff under the WARN Act, and that the Bureau failed to serve it with notice within the applicable time period.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must

look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A. Extension of layoff period**

Under the WARN Act, an employer generally must provide affected employees with written notice of a "mass layoff" at least 60 days in advance. 29 U.S.C. § 2102(a). A mass layoff includes a reduction in force that is not caused by a plant closing and that results in "employment loss" for at least 33% of the full-time employees and at least 50 full-time employees at a single site of employment. *Id.* § 2101(a)(3)(A)-(B)(i). A layoff exceeding six months is generally treated as an employment loss. *Id.* § 2101(a)(6)(B).

In this case, the parties agree that the April layoff falls within the Act's general definition of mass layoff. The parties dispute, however, whether it also falls within 29 U.S.C. § 2102(c), a provision that qualifies the term "employment loss." That section provides:

> A layoff of more than 6 months which, at its outset, was announced to be a layoff of 6 months or less, shall be treated as an employment loss under this chapter unless—
>
> (1) the extension beyond 6 months is caused by business circumstances (including unforeseeable changes in price or cost) not reasonably foreseeable at the time of the initial layoff; and
>
> (2) notice is given at the time it becomes reasonably foreseeable that the extension beyond 6 months will be required.

Under section 2102(c), the threshold inquiry is whether the layoff, "at its outset, was announced to be a layoff of 6 months or less."[3] The Union contends that the Bureau never made such an announcement. According to the Union, the Bureau told the employees that the April

---

[3] The parties have devoted much attention to the question whether the Bureau initially *believed* that the April layoff would last six months or less. Section 2102(c) is not triggered by the employer's state of mind. By its terms, it applies only when the employer announces (*i.e.*, communicates) its belief to the affected employees.

layoff would be a long one that could continue into 2002. The Union cites the deposition testimony of Nancy Erickson, a former vice president of the Bureau. Erickson testified that, during the meetings announcing the layoff on April 7 and 9, two of the Bureau's representatives, Mike Thompson and Tim Deiman, stated that the layoff would be "a long one" ending "sometime in 2002." (Erickson Dep. at 87-88.) Erickson's recollection is consistent with that of several employees who attended the meetings. The testimony of one employee, for example, indicates that Thompson and Deiman announced that the layoff "was going to be a long one" that would "probably [extend] past the first quarter of [2002]." (Svenningsen Dep. at 9.) Similarly, another employee testified that the employees "would not be called back until after the first quarter of 2002 and . . . probably even later." (Sauers Dep. at 7.)[4] In addition, Erickson testified that, after the meetings, she "[r]egularly" had conversations with employees, telling them of her expectation that the April layoff would be a long one. (Erickson Dep. at 88.)

The Bureau denies that Thompson and Deiman made the statements attributed to them at the meetings. There is support in the record for this position, as well. For instance, the Bureau's human resources manager testified that Thompson "never committed to any time frame as to how long" the layoff would last, and never told the employees that the layoff could extend into 2002. (Maruska Dep. at 47-49.) Moreover, Deiman testified that both he and Thompson announced that the Bureau "had no idea how long [the layoff] was going to go," "was hoping to get everybody back as soon as possible," and "had never seen [a layoff] go very long." (Deiman Dep. at 56-57.)

When presented with this conflicting evidence, a rational factfinder could either believe the Union's witnesses and find that the Bureau announced that the April layoff would be a long

---

4 Four other employees gave similar testimony. (*See* Hoopman Dep. at 9-10; Heilmer Dep. at 8; Bakken Dep. at 14; Roberts Dep. at 8.)

one that could continue into 2002, or it could believe the Bureau's witnesses and find that the Bureau avoided taking a position on the duration of the layoff. Neither finding triggers section 2102(c). Again, the critical question is whether the Bureau announced at the outset that the layoff would last six months or less. The parties have not referred to any evidence in the record that would support a finding that the Bureau did so. Accordingly, section 2102(c) does not apply in this case, and the April layoff was therefore a mass layoff within the meaning of the Act.

**B. Unforeseeable business circumstances exception**

The next issue presented is whether the April layoff is covered by the WARN Act's "unforeseeable business circumstances" exception. *See id.* § 2102(b)(2)(A). Under that exception, the 60-day notice period does not apply if the mass layoff is "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." *Id.* The test for reasonable foreseeability focuses on the employer's business judgment. *Burnsides v. MJ Optical, Inc.*, 128 F.3d 700, 703 (8th Cir. 1997); 20 C.F.R. § 639.9(b)(2). "The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." 20 C.F.R. § 639.9(b)(2); *see Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1061 (8th Cir. 1996) (stating "an employer's commercially reasonable business judgment, rather than hindsight, dictates the scope of the . . . exception"). "An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1); *see Burnsides*, 128 F.3d at 703.

Because the exception is a defense to liability under the Act, the employer bears the burden of proving that it applies. *Loehrer*, 98 F.3d at 1060; 20 C.F.R. § 639.9. With respect to

causation, the Bureau argues that the layoff was caused by XeTel's hold order. According to the Bureau's president, the person who decided to institute the layoff, the hold order was the sole reason for the layoff. (Blanchfield Dep. at 41-42; *see id.* at 43; 2d Blanchfield Aff. ¶ 4; Def.'s Ans. to Plaint.'s Interrogs. ¶ 5.) The Union has not come forward with any evidence suggesting the absence of a causal link between the hold order and the layoff.

With respect to reasonable foreseeability, the evidence demonstrates that the hold order was "sudden, dramatic, and unexpected." It is undisputed that the hold order had a dramatic, negative affect on the Bureau's business. At the time the Bureau received the hold order, XeTel accounted for approximately 60% of the Bureau's booked orders for April 2001, and a majority of its business for the remainder of the year. (Blanchfield Dep. at 31, 85-87; Def.'s Ans. to Plaint.'s Interrogs. ¶ 5.) The hold order caused the Bureau to "immediately halt production on all projects for XeTel," with the exception of "a small amount of product that was already near completion." (2d Blanchfield Aff. ¶ 4.) Whereas the Bureau produced nearly 21,000 printed circuit boards in March, it manufactured less than 12,000 in April, and less than 9,500 in May. (Blanchfield Dep. Ex. 8.) In dollar terms, the value of the Bureau's booked orders decreased from more than $14 million on April 2 to less than $4 million on April 20. (*Id.* Ex. 7.)

As for the sudden and unexpected nature of the hold order, the Bureau's president stated that, "prior to receiving the [hold order], [t]he Bureau had not received any communications from XeTel or Ericsson indicating that such a decision was forthcoming or otherwise indicating that XeTel/Ericsson's need for [boards] would dramatically decreas[e]." (2d Blanchfield Aff. ¶ 4; *see* Blanchfield Dep. at 31.) Nevertheless, relying on Erickson's deposition testimony, the Union argues that the hold order was reasonably foreseeable. Erickson testified that she had observed "boxes and pallets and an exorbitant amount of work sitting" at XeTel's warehouse

during her visits there in November 2000 and early 2001. (Erickson Dep. at 41, 158-59.) Based on her contacts with XeTel, Erickson was "[a]bsolutely not" surprised when the Bureau received the hold order. (*Id.* at 41.) However, after Erickson visited the warehouse, Ericsson told the Bureau's president that he should not be concerned about XeTel's backlog, and that Ericsson wanted the Bureau to continue producing boards. (Blanchfield Dep. at 35-36.) Under these circumstances, no genuine issue of fact exists as to whether the Bureau exercised commercially reasonable business judgment in believing that XeTel would continue to order and buy boards. The hold order was not reasonably foreseeable until on or about April 5, the date on which the Bureau received it.

Having concluded that the Bureau has satisfied its burden of demonstrating that the unforeseeable business circumstances exception applies, the Court will now consider whether the Bureau complied with its duty under that exception to "give as much notice [of the mass layoff] as is practicable," including "a brief statement of the basis for reducing the [60-day] notification period." 29 U.S.C. § 2102(b)(3); *see Burnsides*, 128 F.3d at 704 (discussing employer's obligation to provide notice when employment loss is caused by unforeseeable business circumstances). Although the Bureau argues that it fulfilled this obligation by providing employees with written notice of the layoff at the meetings held on April 7 and April 9, those notices fall short of the WARN Act's requirements for three reasons.

First, when an employer conducts a mass layoff that affects employees represented by a union, the employer must provide the notice to the union. 29 U.S.C. § 2102(a)(1). It does not appear that the Bureau served the Union with the notices issued on April 7 or April 9. Second, the notices do not include "a brief statement of the basis for reducing the [60-day] notification period," as required by section 2102(b)(3). Third, under the regulations promulgated pursuant to

the WARN Act, a notice must contain: (1) the name and address of the employment site where the mass layoff will occur and the name and telephone number of a company official to contact for further information; (2) a statement as to whether the planned action is expected to be permanent or temporary; (3) the expected date of the first separation and the anticipated schedule for making separations; and (4) the job titles of positions to be affected and the names of the workers currently holding affected jobs. 20 C.F.R. § 639.7(c)(1)-(4) (2002). The Bureau's notices do not include the name of a company official to contact for further information, a statement as to whether the layoff was expected to be permanent or temporary, and the titles of affected jobs and names of workers who held those jobs. (*See* Maruska Aff. Exs. A-B.)

The only other document in the record that arguably meets the requirements of a WARN Act notice is the Bureau's June 5 letter to the Union. As with the notices issued at the meetings, the letter does not disclose all of the required information. For example, it does not name the workers holding the affected jobs, nor does it explain whether the Bureau expected the layoff to be permanent or temporary. More importantly, the letter did not provide the Union with "as much notice as . . . practicable." *See* 29 U.S.C. § 2102(b)(3). By arguing that the notices issued at the meetings on April 7 and 9 constituted WARN Act notices, the Bureau concedes that it could have given notice on those dates. The letter to the Union was sent approximately two months later. This delay exceeds by at least seven weeks the notice period found acceptable in other cases applying section 2102(b)(3). *See, e.g.*, *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998) (seven days); *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997) (two days); *Loehrer*, 98 F.3d at 1057, 1062-63 (seven and eight days); *Jurcev v. Cent. Cmty. Hosp.*, 7 F.3d 618, 619-20 (7th Cir. 1993) (same day).

In sum, once the Bureau received the hold order from XeTel, it had a duty to provide the Union with a written WARN Act notice of the April layoff as soon as practicable. *See* 29 U.S.C. § 2102(b)(3). Neither the notices given to the employees at the April meetings nor the June 5 letter to the Union fulfilled the Bureau's obligation. The Union is therefore entitled to summary judgment on the issue of the Bureau's liability under the WARN Act.

**C. Affected employees**

Under the WARN Act, only "affected employees" are entitled to written notice of a mass layoff. *Id.* § 2102(a). The term "affected employees" means "employees who may reasonably be expected to experience an employment loss as a consequence of a proposed . . . mass layoff by their employer." *Id.* § 2101(a)(5). There is no dispute that the employees laid off in April were entitled to notice. The Union argues that the employees laid off in January 2001 were entitled to notice, as well.

In deciding this issue, the Court is guided by the Eighth Circuit's decision in *Teamsters Local 838 v. Laidlaw Transit, Inc.*, 156 F.3d 854 (8th Cir. 1998). In *Laidlaw*, the employer laid off a number of seasonal school-bus drivers in June. *Id.* at 855. The drivers reasonably expected to be rehired at the beginning of the next school year in September. *Id.* In July, the employer notified its employees that it would be closing its plant in September. *Id.* The drivers' union sued the employer under the WARN Act, alleging that the employer had failed to provide timely notice of the plant closing. *Id.* The district court granted summary judgment for the employer and the Eighth Circuit affirmed. *Id.* Of interest here is the Eighth Circuit's rejection of the position that the drivers were "affected employees" with respect to the September plant closing:

> We . . . believe that it is not legally significant that [the drivers'] temporary layoff was eventually converted into a termination when the plant closed in September. At that time, they lost only the immediate expectation of

> being rehired, and loss of the expectation of employment is not an "employment loss" under the WARN Act.

*Laidlaw*, 156 F.3d at 856.

The Union contends that *Laidlaw* does not govern this case because it involved seasonal, rather than year-round, employees, but it has failed to explain why a case involving year-round employees should be decided differently. Like the seasonal drivers in *Laidlaw*, the employees laid off by the Bureau in January had a reasonable expectation that they would recalled. Given that the drivers in *Laidlaw* were not affected employees with respect to the subsequent plant closing that "converted [their layoff] into a termination," *id.*, it follows that the employees laid off in January are not affected employees with respect to the subsequent April layoff, which, at most, merely diminished the likelihood that they would be recalled. The Court therefore concludes as a matter of law that those employees were not "affected employees" entitled to notice of the April layoff.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. The Union's Motion for Partial Summary Judgment and Appointment of Special Master [Docket No. 23] is GRANTED IN PART and DENIED IN PART.

2. The Bureau's Motion for Summary Judgment [Docket No. 11] is GRANTED IN PART and DENIED IN PART.

Dated: July 9, 2003

JOAN N. ERICKSEN
United States District Judge